# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIE FRANKLIN, ) | |
| ) | 13-cv-470 |
| Plaintiff. ) | |
| ) | Judge Sharon Johnson Coleman |
| v. ) | |
| ) | |
| DANIEL BLACKMAN, Star No. 7954, ) | |
| MATTHEW JOHNSON, Star No. 14518, and ) | |
| THE CITY OF CHICAGO, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

On October 22, 2012, two Chicago police officers apprehended and arrested Willie Franklin in front of his house, reasonably believing that Franklin may have committed a serious assault. Franklin sued the officers, Daniel Blackman and Matthew Johnson, under 42 U.S.C. § 1983, alleging that the City's police officers violated his civil rights by arresting him and using excessive force during the arrest. He also sued the officers, as well as the City of Chicago, for the tort of malicious prosecution, alleging that the officers and the City maliciously facilitated criminal charges against him. The officers and the City move for summary judgment on all claims. The Court grants the motion as to the false-arrest and malicious prosecution claims because they fail as a matter of law, and the Court denies the motion as to the excessive force claims because of a genuine dispute as to material fact.

**BACKGROUND**

In the late afternoon of October 22, 2012, Officers and Blackman were on patrol in the Englewood neighborhood when they received a call about an armed assault against a woman holding a baby. Dep., Dkt. # 50-1 at 5–6; Blackman Dep., Dkt. # 50-2 at 15, 20–21. Dispatch described the assailant as a black male in blue jeans and a blue jacket, with dreadlocks. Blackman explained in his deposition that he and Johnson decided to respond because the suspect was possibly armed and because the assault occurred near a high school. They drove eastward down 69th Street toward Normal. *Id.* at 23.

As the officers drove toward the intersection of 69th Street and Normal, Blackman observed an individual matching the description of the assailant. *Id.* at 24–25. According to Blackman, the individual was walking westbound down 69th Street toward S. Lowe Avenue. The officers made an abrupt u-turn on 69th Street, and Blackman observed the individual flee southbound on Lowe. *Id.* at 31. The officers pursued a person that they believed to be a "suspect" on Lowe roughly halfway down the block. *Id.* at 33–34. Blackman stated in his deposition that he observed the suspect standing in front of the front gate of a house. *Id.* at 34. The house was located on the 6900 S. Lowe block, directly one block east of the location of the armed assault at 6912 S. Union. Franklin Dep., Dkt. # 50-5 at 158. The officers got out of their patrol car, and Blackman stated in his deposition that he had his gun drawn because he believed "the subject to be armed" based on the call from dispatch. Dkt. # 50-1 at 36. Blackman identified himself as a police officer and yelled for the suspect to stop. Blackman stated in his deposition that he observed the individual whom he believed to be the suspect cross the gate and run up a front porch at the house. Johnson's recollection of events is similar.

According to Willie Franklin, on October 22, 2012, he was working on his car in the backyard of his house at 6912 S. Lowe Avenue. Franklin Dep., Dkt. # 50-5 at 15. He wore a blue jacket and dreadlocks. *Id.* at 40, 71. Franklin stated in his deposition that he had walked around the house to the front and was standing on the front porch when he noticed police officers approaching his house. *Id.* at 18. Franklin observed five police officers, guns drawn, get out of three different patrol cars. *Id.* at 19–20. Franklin stated that he was carrying a plastic bag containing a car part. *Id.* at 24–25. His two pit bulls were in the front yard. *Id.* at 25.

The parties greatly contest what happened next during the confrontation in front of 6912 S. Lowe Avenue. Blackman stated in his deposition that he heard Franklin yell for someone inside the house to open the door. Blackman Dep., Dkt. # 50-2 at 41. Blackman told Franklin that an assailant had recently attacked someone with a gun around the corner and instructed Franklin to come outside the gate to speak with the officers. *Id.* at 42. According to Blackman, he saw that Franklin had his hands inside the blue jacket, and when Blackman asked Franklin to show his hands, Franklin would not comply. *Id.* at 42–43.

The officers, still with guns drawn, approached Franklin on the front porch. *Id.* at 49. Franklin held both hands inside his jacket, according to Blackman. *Id.* at 40. According to the officers, Johnson attempted to secure Franklin by grabbing Franklin's elbow, and a scuffle ensued, with Officer Blackman ordering Franklin to stop resisting. The physical altercation subsided after Officer Blackman performed an "emergency takedown" of Franklin after which a struggle continued until handcuffs were placed on Franklin with Johnson's assistance. *Id.* at 51–85.

Franklin contends that he was standing on the front porch when the officers yelled to him that they would shoot him and his dogs if Franklin did not drop the bag he was holding. Franklin

3

Dep., 50-5 at 26. Franklin stated in his deposition that he immediately dropped the bag and then began to walk toward the officers who unlatched the gate and grabbed Franklin as he stood near the bottom of the porch stairs. *Id.* at 29, 32. Franklin stated in his deposition that after being pulled outside his gate the officers frisked him, as he stood with his hands resting on the fence, by patting down the outside of his clothes with their hands. *Id.* at 36, 41. According to Franklin, he stood tall with his legs spread and his hands resting on the fence. *Id.* at 44.

Franklin claims that without provocation one of the officers, Blackman or Johnson, struck him numerous times in his back while he was kicked and punched numerous times by more than one officer in the chest and face while he repeatedly screamed for his mother. *Id.* at 43–50. He stated that when he was thrown to concrete he was held down and handcuffed. *Id.* at 52–69. Franklin further details continuous kicking in the face. *Id.* at 66–70. Franklin recalled that, at some point, officers picked him off the ground and put him in a patrol car. *Id.* at 71–72. More officers and police cars then arrived at the scene, according to Franklin. *Id.*at 72, 76.

Additional uncontested facts include statements from Officer Doyle, Denise Davis, and Ashley Wilson. There were three witnesses to various portions of the arrest in question. Officer Patrick Doyle was also on patrol in October on W. 69th Street when he received the radio call about the armed assault by a dreadlocked man in a blue jacket. Doyle Dep., Dkt. # 50-4 at 6, 15. Doyle made a u-turn and observed a marked patrol car turning southbound on Lowe. *Id.* at 7. Doyle drove southbound on Lowe and observed a parked patrol car and two officers with a handcuffed man, who was the same individual that Doyle had seen walking on 69th Street. *Id.* at 7–8. Doyle stated that he did not see the officers use any force on Franklin or take Franklin down to the ground. *Id.* at 10.

Denise Davis lived on the block of 69th and Lowe. Davis was sitting at home when she heard someone yell "mom." Davis Dep., Dkt. # 56-2 at 5. Davis ran outside and saw one patrol car and two police officers. *Id.* at 7. Davis, standing across the street and four houses down from Franklin's house, observed the two officers standing over Franklin on the ground. *Id.* at 7–8. Davis stated in her deposition that one officer hit Franklin a few times with a stick and that the other officer kicked him about two times in the head. *Id.* Davis recalled that she then saw the officers pick Franklin up and place him in the patrol car. *Id.* at 8.

Additionally, another neighbor, Ashley Wilson submitted a one-paragraph, handwritten statement in which she stated that she "came out the door," saw Franklin yelling, and saw "an officer hit [Franklin]" while Franklin was on the ground. Dkt. # 56-11 at 2. The statement is dated "10-22-2012."

The parties do not dispute the post-arrest events. Blackman and Johnson took Franklin into custody and drove him to where the assault victim was waiting with a police officer for identification. Blackman Dep., Dkt. # 50-2 at 89. The victim looked inside the patrol car and informed the officers that Franklin was not the assailant. *Id.* at 92–93.

The officers then took Franklin to the station for processing and to charge him with obstruction and resisting arrest. *Id.* at 93. Blackman prepared an arrest report and, because Blackman had to use force to detain Franklin, Blackman also prepared a "TRR report." *Id.* at 99. Blackman stated in his deposition that he did not see any injuries on Franklin, that Franklin did not complain of any injuries, and that Franklin did not ask to visit a hospital. *Id.* at 116.

Franklin stated in his deposition that, at the police station, he requested medical treatment but that the police did not provide it. Franklin Dep., Dkt. # 50-5 at 94. Franklin recalled that he

5

told an officer that he was in pain and injured. *Id.* at 95. Franklin also stated that he had no blood on him. *Id.* at 96.

The following morning, the police released Franklin from custody after charging him for resisting a peace officer and obstruction of identification, and Franklin and his mother went to the hospital. *Id.* at 107. Franklin stated in his deposition that he told hospital staff that he was in pain and had swelling. *Id.* at 111. Hospital records showed Franklin was examined by Dr. Dante Pimentel, although Dr. Pimentel had no independent recollection. Pimentel's medical records indicated that Franklin's chief complaint was coughing and pain associated with coughing. Pimentel Dep., Dkt. # 50-6 at 14. Pimentel stated that his medical notes did not reflect that Franklin complained of being beaten, kicked, stomped on, hit with a baton, or involved in a physical fight. *Id.* at 15, 28. Pimentel's medical report described Franklin's "general appearance" as "well," "awake," and "alert." *Id.* at 15–16. The report also described Franklin's head as "normal" and Franklin's face as "normal." *Id.* at 16. Pimentel stated there were no acute findings of trauma on Franklin's head, face, neck, back, arms, or legs. *Id.* at 16–20. Pimentel testified that Franklin did not complain to him of neck pain or back pain. *Id.* at 18–19. Although Franklin complained of bruising to Pimentel, Pimentel did not see any based on a skin exam. *Id.* at 24. X-rays of Franklin's chest and ribs, ordered to rule out pneumonia based on his coughing complaints, indicated to Pimentel that Franklin did not have any fractures. *Id.* at 30.

**LEGAL STANDARD**

A court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact" and if that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court, when determining whether summary judgment is

proper, views the record in the light most favorable to the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55 (1986); *accord Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

**DISCUSSION**

Franklin asserts that the defendant police officers deprived him of his Fourth and Fourteenth Amendment rights by arresting him for any reason without legal cause and by doing so with excessive force in violation of 42 U.S.C. § 1983. The defendants move for judgment in their favor, arguing that the undisputed facts demonstrate that they had probable cause to arrest Franklin and arguing that they used reasonable force in making the arrest.

*1) Unreasonable Seizure*

The Fourth Amendment guarantees that the "right of the people to be secure in their persons . . . against unreasonable . . . seizures . . . shall not be violated." U.S. Const. Amend. IV. This prohibition binds the states. *Wolf v. Colorado*, 338 U.S. 25, 27–28 (1949).

A police officer's warrantless seizure of an individual is generally reasonable under the Fourth Amendment if the officer has "probable cause" for it. *Draper v. United States*, 358 U.S. 307, 310–11 (1959). Illinois law authorizes police to execute warrantless arrests when an officer has "reasonable grounds to believe" that the person has committed an offense. 725 Ill. Comp. Stat. 5 / 107-2. "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959). But the "probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *see Abbott v.*

*Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (summarizing case law on the meaning of "probable cause").

Viewing the facts in the light most favorable to Franklin, Blackman and Johnson had probable cause to arrest Franklin. First, Franklin concedes that the officers had reasonable suspicion to stop him. Pl. Br., Dkt. # 55 (recognizing that the officers "were entitled to conduct a *Terry* or investigative stop"). Here, police dispatch informed police officers that an armed assailant, a black man with dreadlocks in a blue jacket, attacked a woman holding a baby. Moments later, Blackman and Johnson observed a man matching that description who was walking in the vicinity of the crime. The officers followed the individual to a location in front of Franklin's house. Franklin, who has no knowledge of Blackman's and Johnson's actions prior to his encounter with the officers, maintains that he was standing on his front porch when police officers happened to approach his house. He acknowledges that he had dreadlocks and was wearing a blue jacket. He also acknowledges that his house was only one block east of the location of the assault. Under the circumstances, drawing all factual inferences in favor of Franklin, Blackman and Johnson reasonably believed that Franklin, standing on his front porch, was the same man whom they had just pursued down Franklin's street. A reasonable officer could conclude that probable cause existed to believe that Franklin committed the armed assault.

Two further points require brief discussion. First, the fact that the assault victim ultimately related that Franklin was not her assailant does not invalidate the prior arrest. An arrest made with probable cause is not illegal because the police mistakenly, but reasonably, arrest an innocent person. *Hill v. California*, 401 U.S. 797, 802–03 (1971). Second, although the Fourth Amendment generally prohibits the police from arresting the person at his home without an arrest warrant, *Payton v. New York*, 445 U.S. 573, 576 (1980), under the "hot-pursuit

doctrine," the police may enter a home when they do so in pursuit of a suspect whom they reasonably believe has recently committed a crime. *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967). In this case, the officers' entry into Franklin's yard was permissible because the officers reasonably believed that they were in pursuit of Franklin. Franklin's unreasonable-seizure claim fails because, viewing the facts in the light most favorable to Franklin, the officers' arrest of Franklin did not violate the Fourth Amendment.[1]

*2) Excessive Force*

The underlying legality of an arrest does not authorize police to use unlimited force in making that arrest. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff*, 134 S. Ct. at 2020; *accord Morfin v. City of E. Chi.*, 349 F.3d 989, 1004 (7th Cir. 2005). The Supreme Court has explained that "determining the objective reasonableness of a particular seizure under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Plumoff*, 134 S. Ct. at 2020 (internal quotation marks omitted). In other words, the "inquiry requires analyzing the totality of the circumstances." *Id.*; *accord Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000). Federal courts must approach these questions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation marks omitted).

Here, Franklin alleges both that the use of *any* force was unreasonable and that the amount of force used was excessive. The Court rejects out of hand Franklin's argument that the

---

[1] The officers move for summary judgment, in part, based on qualified immunity, but the Court need not resolve this. When confronted with a qualified-immunity arguments, federal courts have discretion to determine first "whether a constitutional right would have been violated on the facts alleged." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).

police were unauthorized to use *any* force. Even under Franklin's version of the facts, the police were looking for an armed assailant who had just committed a violent crime in the near vicinity of Franklin's house. The real question is whether the *degree* of force used was excessive under the Fourth Amendment.

The defendant officers argue that "no constitutional right was violated." Defs. Br., Dkt. # 49 at 5. They contend that they used force to prevent Franklin from fleeing and to protect themselves and the public. Specifically, they state that no constitutional violation occurred "when they utilized the escort hold, pressure sensitive technique, lumbar technique, or performed an emergency takedown." *Id.* at 6. The officers explain that Franklin "was actively resisting . . . by dropping his shoulder and twisting away, by stiffening up, and by grabbing onto the fence post with both hands." *Id.* As stated earlier, Franklin's version of events differs dramatically from the officers' version. The facts, viewed in the light most favorable to Franklin, indicate that Franklin complied with all the officers' instructions and did not resist in the least at any point. Franklin Dep., Dkt. # 50-5 at 28, 43–44, 195–96. Despite this, the officers purportedly beat Franklin with a baton, punched him, kicked him, and stomped on his head. The officers do not argue that Franklin's version of the facts would not constitute a constitutional violation. Instead, the officers argue that "the record discredits [Franklin's] claims so much that no reasonable jury could find that the use of force was excessive." Defs. Br., Dkt. # 49 at 6.

The officers rely on *Scott v. Harris*, 550 U.S. 372, 380 (2007), where the Court provided an important statement on the summary-judgment standard: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Applying this rule, the Supreme Court held that a police officer

was entitled to qualified immunity from a § 1983 suit because the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Scott*, 550 U.S. at 380.

The Court finds that *Scott* is inapplicable for two reasons. First, *Scott* concerned a videotape, an objective piece of evidence that "quite clearly" showed that the plaintiff's account was simply beyond all belief. *Scott*, 550 U.S. at 378–79. With just one arguable exception,[2] the Seventh Circuit has applied the *Scott* rule only when *video evidence* discredited the plaintiff's version of events. *See Barrett v. Wallace*, 570 F. App'x 598, 601 (7th Cir. 2014) (video recording); *Rivera v. Jimenez*, 556 F. App'x 505, 506–07 (7th Cir. 2014) (44-minute video); *Gillis v. Pollard*, 554 F. App'x 502, 506 (7th Cir. 2014) (video recordings); *Johnson v. Moeller*, 269 F. App'x 593, 596 (7th Cir. 2008) (security tape).[3]

Second, even if the *Scott* rule did apply to all forms of evidence, *Scott*'s standard is exceptionally high. To invoke successfully the *Scott* rule, it is insufficient for a party just to show that portions of the record discredit the opposing party's version of the facts. *Id.* at 380. Rather, the party invoking *Scott* must show that the other party's version of the facts so

---

[2] In *Holt v. Ford Motor Co.*, a plaintiff sued a car dealership for repossessing his vehicle after he defaulted on his purchase contract. 275 F. App'x 553, 554 (7th Cir. 2008). The plaintiff argued that the dealership forged his signature on the purchase contract and that he, instead, bought the vehicle under an oral contract at a lower price. The plaintiff submitted an affidavit in which he swore that he did not sign the contract because he always signed with his middle initial, which he did not do on the purchase contract. The dealership's handwriting expert opined that the signature on the contract was indeed the plaintiff's. Based on this, and the plaintiff's admission that he sometimes signed without out his middle initial, the Seventh Circuit, invoking *Scott*, held in an unpublished order that the plaintiff's version of the facts was "belied by the evidence in the record." *Id.*

[3] Moreover, the Seventh Court has affirmatively characterized the *Scott* exception as a rule about video evidence. *See Rivera*, 556 F. App'x at 507 ("[G]ranting summary judgment for the defendant is appropriate when a video discredits the plaintiff's version of events."); *Gillis*, 554. F. App'x at 506 ("[W]here video evidence contradicts the plaintiff's version of events, the court should not accept the plaintiff's story for purposes of summary judgment.").

11

"*blatantly contradicted*" and "*utterly discredited* by the record" such that "*no reasonable jury*" could believe it. *Id.* Here, the Court cannot say that the record so blatantly contradicts Franklin's version such that no *reasonable* jury would believe it. Franklin's own statements along with that of neighbors and a chiropractor create a disputed issue of fact to survive a summary judgment motion.

*3) Malicious Prosecution*

In addition to bringing two § 1983 claims, Franklin sues the officers and the City of Chicago for the tort of malicious prosecution. Under Illinois law, malicious prosecution requires: 1) commencement of a legal proceeding against a plaintiff; 2) termination of the proceedings in favor of the plaintiff; 3) the absence of probable cause for the proceeding; 4) malice on the part of the party who initiated the proceeding; and 5) damages to the plaintiff. *Hurlbert v. Charles*, 938 N.E.2d 507, 513 (Ill. 2010); *accord Williams v. City of Chi.*, 733 F.3d 749, 759 (7th Cir. 2013).

Here, it is undisputed that Blackman and Johnson each signed a criminal misdemeanor complaint against Franklin for resisting a peace officer, in violation of 725 Ill. Comp. Stat. 5 / 31-1(a), and that Johnson filed such a complaint against Franklin for obstruction of identification, in violation of 5 / 31-4.5(a). Dkt. # 56-8 at 4–6. After signing the criminal complaint, Blackman never went to court on the charge or received any notification or information about the status of the case. Blackman Dep., Dkt. # 50-2 at 105–06. Johnson could not recall whether he ever went to court on the charges and could also not recall any information about his complaints against Franklin. Johnson Dep., Dkt. # 50-3 at 21–22.

Franklin's malicious-prosecution claim fails because there is no evidence in the record that criminal proceedings were dismissed in Franklin's "favor," within the meaning of Illinois law. Under Illinois law, "a malicious prosecution action cannot be predicated on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The state's mere abandonment of suit, such as through an entry of nolle prosequi, does not satisfy the favorable-termination element. *Id.* at 1242–43.

Franklin alleges in his complaint that the "criminal proceedings were terminated in the plaintiffs' favor on or about January 11, 2013." Franklin maintains that the charges were "dismissed" on that date. Dkt. # 56 at 5. The certificate of disposition in the record, however, merely states: "Stricken Off – Leave Reinstate." Dkt. # 56-15 at 3. This does not indicate the "termination of the proceeding in favor of the plaintiff" under Illinois law. *Swick*, 662 N.E.2d at 1242. It may simply indicate that the complainants, i.e., Blackman and Johnson, did not appear in court. Because there is no evidence in the record that criminal proceedings were dismissed in Franklin's "favor" within the meaning of Illinois law, the Court grants summary judgment for the defendants on this claim.

**CONCLUSION**

The Court grants the defendants' motion [48] for summary judgment on the unreasonable-seizure claims and the malicious-prosecution claims, and the Court denies the motion on the excessive-force claims. The Court also dismisses the City of Chicago as a party.

_____
SHARON JOHNSON COLEMAN
United States District Judge

DATED: November 25, 2014